# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles Norgle | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5962 | **DATE** | 3/30/2004 |
| **CASE TITLE** | Citizens Advocate Team, et al. Vs. United States Dep't of Transportation, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Before the court are Plaintiffs' Motion for Summary Judgement [37-1] and Defendants' Motions for Summary Judgment [45-1], [47-1] and [51-1]. For the reasons stated on the attached order, Plaintiffs' motion [37-1] is DENIED; Defendants' motions [45-1], [47-1] and [51-1] are GRANTED. The Clerk shall enter judgment in favor of all Defendants pursuant to Fed. R. Civ. P. 58. (See attached Opinion and Order).

*Charles R Norgle*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | MAR 3 1 2004 | date docketed | **57** |
| ✔ | Docketing to mail notices. | | | |
| ✔ | Mail AO 450 form. | | JXM docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials |

U.S. DISTRICT COURT CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CITIZENS ADVOCATE TEAM, and<br>HOWARD and NEVINA ZARBOCK<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION; NORMAN<br>MINETA, Secretary, United States<br>Department of Transportation; FEDERAL<br>HIGHWAY ADMINISTRATION;<br>MARY PETERS, Director, Federal<br>Highway Administration; NORMAN<br>STONER, Division Administrator,<br>Federal Highway Administration;<br>ILLINOIS DEPARTMENT OF<br>TRANSPORTATION; KIRK BROWN,<br>Secretary, Illinois Department of<br>Transportation; KANE COUNTY<br>DIVISION OF TRANSPORTATION;<br>JEFFREY DAILEY, Director, Kane<br>County Division of Transportation;<br>KANE COUNTY BOARD,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> Case No. 02 C 5962<br>)<br>)<br> Honorable Charles R. Norgle<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge.

The Parties have filed Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Plaintiffs' motion is denied; Defendants' motions are granted.

# I. INTRODUCTION

On August 21, 2002, Plaintiffs, Citizens Advocate Team ("CAT"), Howard Zarbock and Nevina Zarbock (collectively "Plaintiffs"), filed a Complaint under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, against various governmental Defendants in connection with the proposed construction of three new bridges across the Fox River in Kane County, Illinois. In essence, Plaintiffs allege that the Final Environmental Impact Statement prepared by Defendants, with respect to this project, fails to meet the requirements of both the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-47, and Section 4(f) of the Federal Transportation Act, 49 U.S.C. § 303(c). Plaintiffs Complaint seeks, *inter alia*: (1) a declaratory judgment that the Federal Highway Administration's approval of the project was unlawful and (2) an injunction prohibiting Defendants from taking any further action toward the construction of the project until they have complied with all of the requirements of NEPA and Section 4(f) of the Transportation Act.

There are numerous parties to this litigation. Plaintiff CAT is a regional conservation organization which seeks to protect the public trust and is organized as a non-profit corporation under the laws of the State of Illinois. Plaintiffs Howard and Nevina Zarbock are members of CAT and residents of Kane County, Illinois. The Zarbocks allege that they own property located adjacent to one of the proposed construction sites. The named Defendants are the United States Department of Transportation ("USDOT"); Norman Mineta, in his official capacity as Secretary of USDOT; the Federal Highway Administration ("FHWA"); Mary Peters, in her official capacity as the Director of FHWA; Norman Stoner, in his official capacity as Division Administrator of FHWA; the Illinois Department of Transportation ("IDOT"); Kirk Brown, in his official capacity as Secretary of IDOT; the Kane County Division of Transportation

("KDOT"); Jeffrey Dailey, in his official capacity as Director of KDOT; and the Kane County Board (collectively "Defendants").

## II. BACKGROUND[1]

In 1989, to relieve traffic congestion on existing bridges, KDOT initiated procedures to develop and construct alternative bridge crossings over the Fox River. In February 1990, the Fox River Bridge Advisory Committee ("Advisory Committee") was formed consisting of representatives from townships, municipalities and counties located near the Fox River. The Advisory Committee was charged with reducing the myriad of bridge proposals made within the prior ten year period, thereby allowing for a reasonable number of site and engineer feasibility studies to be conducted. In April 1991, the Chicago Area Transportation Study published two studies: (1) the *1990 Kane County Transportation Study* ("*Transportation Study*") and (2) the *1990 Fox River Bridge Traffic Study* ("*Traffic Study*"). After evaluating the *Traffic Study*, the Advisory Committee selected four sites for further investigation. The Advisory Committee then directed KDOT to conduct a site engineering feasibility study for each of the four sites. KDOT hired Alfred Benesch & Company to conduct these studies. In 1993, Alfred Beneshch & Company published the *Feasibility Studies of Four New Bridges Crossing the Fox River* ("*Feasibility Studies*").

After reviewing the *Transportation Study*, the *Traffic Study* and the *Feasibility Studies*, the FHWA determined that under NEPA, the development of one Environmental Impact Statement ("EIS") was necessary for evaluating environmental impacts arising out of the proposed Fox River Bridge crossings. FHWA's determination that the projects were related was

---

[1]The undisputed facts are taken from the Parties' Local 56.1 Statements. All disputed facts, if any, are noted in the text.

3

based on several factors, including that the common goal was to provide for projected significant increases in east-west traffic volumes across the Fox River. These increases were due to residential expansion into western Kane County and economic growth in eastern DuPage County. Upon making this determination, FHWA directed KDOT to evaluate twelve roadway-bridge corridors as part of the EIS for the bridge project. KDOT eventually reduced their evaluation from twelve corridors to five.

On November 1, 2001, Defendants issued the Final Environmental Impact Statement and Section 4(f) Evaluation ("Final EIS"). The Final EIS divided the analysis of the five proposed corridors into three regions-North, Central and South. Of the five proposed corridors, the Final EIS recommended the construction of three. At issue in this case is the corridor recommended for construction in the North Region, defined as bounded by McHenry County on the North and Interstate 90 on the south. This project is commonly referred to as the Bolz Road corridor (hereinafter "The Bolz Bridge Project").[2]

On May 13, 2002, the Division Administrator of the FHWA issued its Record of Decision ("ROD") approving the Final EIS. The ROD states that the "build alternatives" for the three bridge crossings recommended in the EIS: (1) best satisfied the purpose and need developed for the study; (2) posed the least impact to the natural and human environment; (3) had been selected based on processes in compliance with NEPA and other applicable requirements; and (4) remained eligible for Federal Highway funding. As a result, FHWA determined that Kane County, as project sponsor, could advance each crossing through the project development process.

---

[2]Plaintiffs' Complaint does not address the adequacy of the Final EIS with respect to the corridors proposed for the Central and South Regions.

On August 21, 2002, Plaintiffs filed this lawsuit challenging the FHWA's decision to issue the ROD and the sufficiency of the Final EIS. All parties have filed cross-motions for summary judgment, which are now before the court.

## III. DISCUSSION

### A. Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999). In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing the motion. Fed. R. Civ. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

In this case, there are no genuine issues of material fact presented. The FHWA's decision to issue the ROD was based on a voluminous administrative record which contains the

EIS and the Section 4(f) evaluation of impacts arising out of the construction of the proposed bridge projects. The parties do not dispute the nature of the documents in the administrative record. The parties only dispute whether the FHWA's decision to issue the ROD complies with the standards set forth under the APA. Therefore, the standard of review is that provided by the APA.

## B. Standard of Review under the Administrative Procedures Act

Review of an agency action under NEPA and the Federal Transportation Act is governed by the APA. Highway J Citizens Group v. Mineta, 349 F.3d 938, 952 (7th Cir. 2003). Under the APA, the court will set aside the agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Although the overall standard is narrow in scope, it still requires the court to conduct a "searching and careful" inquiry. Highway J Citizens Group, 349 F.3d at 952 (citations omitted). To determine whether the agency action falls within this standard, the court "must consider 'whether the decision was based on consideration of the relevant factors and whether there has been clear error of judgment.'" Indiana Forest Alliance, Inc. v. United States Forest Service, 325 F.3d 851, 858-59 (7th Cir. 2003) (quoting Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989)). "If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." Indiana Forest Alliance, 325 F.3d at 859. This deferential standard requires that the court not substitute its judgment for that of the agency. Id.; Heartwood, Inc. v. United States Forest Service, 230 F.3d 947, 953 (7th Cir. 2000). As long as the "federal agency has heard all of the objections to a plan and considered all of the sensible options before it, the agency has fulfilled its duty." Simmons v. U.S. Army Corps. Of Engineers,

120 F.3d 664, 667 (7th Cir. 1997). In other words, in applying the arbitrary and capricious standard under the APA, the court's only obligation is to ensure that the agency has taken a "'hard look' at the environmental consequences." Highway Citizens Group, 349 F.3d at 953 (quoting Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976)).

In this case, Plaintiffs' argue that the FHWA's decision to issue the ROD was arbitrary and capricious because it was based on an inadequate Final EIS. Plaintiffs contend that the Final EIS is insufficient for several reasons. Specifically, Plaintiffs argue that the Final EIS: (1) fails to address the consequences of growth-inducing and traffic-inducing impacts associated with the Bolz Bridge Project; (2) fails to measure the impact of the proposed bridges upon projected ozone and carbon monoxide levels; (3) does not support the dismissal of the socioeconomic effect of the Bolz Bridge project on the neighboring lower-income areas; (4) does not consider a sufficient range of alternatives to the Bolz Bridge Project; and (5) does not justify the use of property protected by Section 4(f) of the Transportation Act.[3] First, the court will address Plaintiffs' claims under NEPA. It will then address Plaintiffs' claims under the Section 4(f) Transportation Act.

## C. National Environmental Policy Act

NEPA establishes a "broad national commitment to protecting and promoting the environment." Highway J Citizens Group, 349 F.3d at 953 (citing Robertson v. Methow Valley Citizens Counsil, 490 U.S. 332, 349 (1989)). Rather than mandating particular results, NEPA

---

[3]Defendants argue that Plaintiffs are barred from seeking judicial review of their claims because they either failed to raise their objections during the administrative process, or, if raised, failed to demonstrate why the impacts were significant to the project. Unless otherwise indicated in the text, the court only addresses Plaintiffs' claims on their merits.

"simply prescribes the necessary process" federal agencies must follow when evaluating the environmental consequences of a proposed project. See id. This process acts as a means of safeguarding against environmental harms. See Davis v. Mineta, 302 F.3d 1104, 1115 (10th Cir. 2002). As long as "the adverse environmental effects of a proposed action are adequately identified and evaluated," NEPA does not prohibit the agency from deciding that other values outweigh the environmental costs. Highway J Citizens Group, 349 F.3d at 953 (quoting Robertson, 490 U.S. at 349).

NEPA is administered by the Council on Environmental Quality ("CEQ"). See 42 U.S.C. § 4342. The CEQ promulgates regulations related to NEPA which are binding on federal agencies. See 42 U.S.C. § 4344(3); 40 C.F.R. §§ 1501-08; see also Heartwood, 230 F.3d at 949. All federal agencies must adopt their own procedures to supplement the CEQ regulations and publish them in the Federal Register. See Rhodes v. Johnson, 153 F.3d 785, 777-78 (7th Cir. 1998). Prior to publication, the agency must consult with the CEQ to ensure that its procedures are in conformity with NEPA and the CEQ regulations. See § 40 C.F.R. 1507.3(a).

NEPA requires an agency to prepare an EIS whenever it determines that the proposed action is a "major Federal action[]" which significantly affects the quality of the human environment. See 42 U.S.C. § 4332(2)(C). The EIS itself is a "detailed analysis and study conducted to determine if, or the extent to which, a particular agency action will impact the environment." Heartwood, 230 F.3d at 949. NEPA requires that the EIS "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action included in the detailed study. See 40 C.F.R. § 1502.14(a). For those alternatives that are eliminated from the detailed study, NEPA requires a brief discussion containing the reason for the elimination. See id.

In addition to evaluating all reasonable alternatives within the EIS, NEPA also requires federal agencies to consider and discuss the environmental consequences of a particular action. 40 C.F.R. § 1502.16. This includes a discussion of both the direct and indirect effects the proposed project will have on the environment. See id. Indirect effects are the reasonably foreseeable effects caused by the action which appear later in time or further in distance. See 40 C.F.R. § 1508.8(b). They may include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." See id. Conclusory statements that growth will occur with or without the proposed project, by themselves, are insufficient; agencies must provide adequate discussions of growth-inducing impacts. Davis v Mineta, 302 F.3d 1104, 1122-23 (10th Cir. 2002). The extent of these discussions, however, is determined by the overall level of significance the agency places on the impacts. See Highway J Citizens Group, 349 F.3d at 960. This is commonly referred to as the rule of reason approach. See id. Ultimately, to determine the adequacy of the EIS with regard to these impacts, the court "must examine the administrative record, as a whole, to determine whether the [Agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1177 (10th Cir. 1999).

### 1. Growth and Traffic Inducing Impacts

Plaintiffs first contend that the Final EIS fails to provide a detailed assessment of growth and traffic inducing impacts as required under NEPA. Specifically, Plaintiffs argue that the Final EIS "reveals no analysis of whether the projected traffic impacts or population impacts took into account the potential growth in the area induced by construction of the Bolz Bridge

9

Project." See Pls.' Mot. For Summ. J., at 7-8. Plaintiffs further contend that the Final EIS contains only conclusory statements which indicate that growth will occur regardless of whether the Bolz Bridge Project is constructed. See id., at 9. Without offering any evidence of negative potential impacts, Plaintiffs conclude that the Final EIS, on its face, does not comply with NEPA's mandate; therefore the FHWA's decision to issue the ROD was arbitrary and capricious. See id.

The court is not persuaded by Plaintiffs' argument. Although the Final EIS contains only a limited discussion of the projected traffic and population increases associated with the construction of the Bolz Bridge Project, the FHWA's decision to issue the ROD was not arbitrary and capricious in light of the minor role these growth-inducing impacts were determined to have on the surrounding area. To comply with NEPA's mandate, an Agency must provide an adequate discussion of growth-inducing impacts in the EIS. See Davis, 302 F.3d at 1123. "A conclusory statement that growth will increase, with or without the project, or that development is inevitable, is insufficient . . . ." Id. (citing Laguna Greenbelt, Inc. v. Unites States Dep't of Transp., 42 F.3d 517, 526 (9th Cir. 1994)). Where the growth-inducing impacts or effects are determined to be minor, however, the agency is not required to quantify all possible effects provided it has reasonably explained why such a quantification is not necessary or feasible. See City of Los Angeles v. Federal Aviation Administration, 138 F.3d 806, 808 (9th Cir. 1998).

As Plaintiffs indicate, the Final EIS does not contain a detailed analysis of the growth-inducing impacts associated with the construction of the Bolz Bridge Project. However, in this instance, such an analysis is unnecessary because the projected impacts at issue are consistent with the overall purpose and need for the project, which focuses on relieving traffic congestion

in Kane County and enhancing development along the Bolz Road corridor. Additionally, these objectives are also consistent with those of the overall regional bridge project. In terms of land use and transportation issues, the Final EIS identifies three objectives for the regional bridge project: (1) to enhance Kane County's transportation network by reducing traffic congestion and providing alternate and more direct routes of travel; (2) to serve efficient land use through efficient access to central business districts, public services, and employment and commercial centers; and (3) to serve proposed land use in performance with Kane County's 2020 Land Resource Management Plan. F.H.W.A. 8341.

When addressing growth-inducing impacts in light of these issues, the Final EIS states:

Improved accessibility across the Fox River and the associated projected traffic increases will enhance the planned development potential of the undeveloped parcels of the Bolz Road Corridor. Growth in these areas is consistent with the policies of local governmental units as reflected in their Comprehensive Plans and Zoning Ordinances (see Section 2.2.1.1).

FHWA 8609. Additionally, when issuing the ROD, the FHWA declared:

[The Bolz Bridge] alternative satisfies the objectives of the Purpose and Need of this project. It reduces congestion on the existing Kane County transportation network by providing alternate and more direct crossings of the Fox River and is compatible with County and local land use plans, while not causing excessive impacts on the human and natural environment.

FHWA 10172.

Thus, the FHWA concluded that the growth-inducing impacts associated with the Bolz Bridge Project were consistent with the overall purpose of the proposed project. When analyzed within the context of the entire administrative record, see Colorado Environmental Coalition, 185 F.3d at 1176, it is clear that the Agency concluded that the growth-inducing impacts from the Bolz Bridge project were insignificant. Satisfied with the studies conducted on the issue, the FHWA determined that there was no basis to quantify all possible traffic and population growth-

11

inducing effects. See City of Los Angeles, 138 F.3d at 808 (asserting that agencies are not required to quantify minor growth-inducing effects); see also Seattle Cmty. Council Fed'n v. FAA, 961 F.2d 829, 835-36 (holding that plans designed to handle existing traffic with greater efficiency are not designed to induce growth). This was a reasoned determination that the court will not second-guess. See Colorado Environmental Coalition, 185 F.3d at 1176 (stating that the court cannot question the wisdom of the agency's decision or its conclusion regarding the magnitude of the impacts); see also Citizens Against Burlington, Inc. v. Busey, 938 F.2d at 190, 201 (D.C. Cir. 1991) (holding that courts must defer to an agency's informed discretion).

### 2. Air Quality

Similarly, without alluding to evidence of any adverse impacts, Plaintiffs next argue that the air quality analysis in the Final EIS does not comply with NEPA standards. Essentially, Plaintiffs contend that the discussions on ozone producing vehicle emissions and carbon monoxide levels do not take into account the potential for increased traffic spurred by the induced growth from the new bridges. However, as the court has discussed, Defendants determined that the projected growth-inducing impacts on traffic associated with the construction of the Bolz Bridge Project were, at most, minor. See supra, Part III.C.1. As such, contrary to Plaintiffs' contention, there is no need for Defendants to include a *detailed* analysis on air quality in relation to these impacts. See City of Los Angeles, 138 F.3d at 808.

Additionally, within the Final EIS Defendants did analyze the impacts the proposed project would have on ozone production and carbon monoxide levels. See FHWA 8594-95; 8392-95. As required by law, these impacts were measured at specific locations within particular regions located within the Chicago Metropolitan Area. It is not the function of the court to determine whether analysis is accurate or whether Defendants used the best

12

methodology available. See Highway J Citizens Group, 349 F.3d 960 (citing that the court only reviews the sufficiency of the agency's consideration of the issues, not its substantive judgment); see also Sierra Club v. Marita, 46 F.3d 606, 621 (7th Cir. 1995) (stating that agencies are entitled to use their own methodology provided it is rational). The court is only to determine whether Defendants thoroughly considered the impact the proposed project would have on these air quality levels. See Laguna Greenbelt, Inc., 42 F.3d at 526.

After analyzing the issues, the Final EIS concludes that the overall project is in compliance with all state and federal air quality statutes. See FHWA 8594-95. Because one of the objectives of the proposed project is to relieve traffic congestion within the region, adverse impacts on air quality were determined to be positive, rather than negative. Thus, based on the numerous studies conducted over a period spanning more than ten years, Defendants concluded that the adverse impacts on air quality were not significant. See FHWA 8536. Applying the rule of reason approach, the analysis presented in the Final EIS was reasonably thorough under the circumstances and NEPA has been satisfied. See Highway J Citizens Group, 349 F.3d 960; see also City of Los Angeles, 138 F.3d at 808. Therefore, the FHWA's decision approving the Final EIS, with respect to air quality, was not arbitrary or capricious. See Citizens Against Burlington, 938 F.2d at 201.

### 3. Socioeconomic Impacts

Plaintiffs also argue that the Final EIS does not adequately discuss the socioeconomic impacts associated with the construction of the Bolz Bridge project. Essentially, Plaintiffs make two arguments on the issue. First, Plaintiffs contend that Defendants did not seriously consider the impact the project would have on the Fox View Apartment Complex ("Fox View"), which is located to the south the proposed alignment. Fox View is subsidized with Section 8 federal

13

funding. Second, Plaintiffs contend that the Final EIS ignores the fact that the proposed corridor acts as a barrier between lower-income and higher-income neighborhoods.

The impacts the Bolz Bridge Project will have on Fox View are discussed in Sections 2.2.1.5 and 4.2.1.6 of the Final EIS. See FHWA 8406-07, 8615. Section 4.2.1.6 states that Fox View "is located approximately a distance of 700 feet from the preferred alignment." FHWA 8615. It also declares that Fox View is located in census tract #8503.01. See FHWA 8406. Because the Bolz Road alignment at issue is predominately located within census tract #8501.00, which has a lower percentage of persons below the poverty level than census tracts ##8503.01 and 8502.01, the Final EIS explains that the corridor passes to the north of the lower-income census tracts. See FHWA 8615. Based on this analysis, the report concludes that "there will not be any disproportionate impacts on Fox View Apartments." See FHWA 8615.

Additionally, the Final EIS states:

> The preferred Bolz Road alignment was realigned further north and away from adjacent census tract #8502.01, as a result of public input from residents during the public hearing, as well as coordination with local leaders. This realignment will provide continued direct access to a playground and park area for the residents of census tracts #8502.01. The local population will also experience no loss in roadway access.

FHWA 8615. Furthermore, in response to comments on the issue, the ROD states:

> The proposed road does not affect residents in lower income/minority concentration areas; the roadway curves away from these areas to the maximum extent possible given right-of-way constraints to limit proximity impacts to residents . . . . While the Fox View apartments are cited as a subsidized housing facility to be affected, the closest unit is 165 meters (550 feet) from the roadway and will suffer no adverse impact.

FHWA 10286.

Because Defendants did not perceive the proposed corridor to have any impacts on Fox View, they were not required to analyze the issue further in the Final EIS. When issuing the ROD, the FHWA thoroughly considered the issue in relation to its significance. See Highway J Citizens Group, 349 F.3d at 960 (adopting the rule of reason approach which considers the extent of the agency's analysis viewed in proportion to the size of the perceived impact). Thus, the FHWA seriously considered the issue and reached a reasoned decision. This is all that NEPA requires. See Citizens Against Burlington, 938 F.2d at 201 (holding that courts must defer to an agency's informed discretion).

Additionally, as to whether the Final EIS ignores the fact that the proposed corridor acts as a barrier between lower-income and higher-income neighborhoods, Plaintiffs fail to show that the issue was raised or how this situation creates an adverse impact. NEPA does not require federal agencies to consider an undefined medley of imponderables and every possible impact from a project. Without adequately placing Defendants on notice of the issue, Plaintiffs argument is waived. See Vermont Yankee Nuclear Power Corporation v. Consumers Power Corporation, 435 U.S. 519, 553-54 (1978) (comments must alert the agency to the particular mistake made and why it is significant).

### 4. Analysis of Alternatives

With respect to alternatives, Plaintiffs argue that the Final EIS fails for two reasons. First, they argue that the Final EIS does not seriously consider the "No-Build" alternative as required under NEPA. Second, Plaintiffs assert that the Final EIS gives "short shrift" to the analysis of alternative corridors proposed for the North Region, thereby also failing to satisfy the requirements of NEPA. See Pls.' Mot. for Summ. J., at 12. The court will address each of Plaintiffs' arguments.

"NEPA requires that agencies 'study, develop, and describe appropriate alternatives' to major federal projects." Highway J Citizens Group, 349 F.3d at 960 (quoting 42 U.S.C. §§ 4332(2)(C)(iii) & 2(E)).  In considering alternatives, the agency must sequentially address three questions: (1) what is the purpose of the proposed project; (2) given that purpose, what are reasonable alternatives to the project; and (3) to what extent it should explore each particular reasonable alternative?  See id. (citing Simmons, 120 F.3d at 668).  Requiring agencies to analyze the issue in this fashion ensures a reasonable alternatives analysis considered in light of the purpose and need for a particular project.  To determine whether the EIS properly resolves these three questions, the court must take a deferential view of the agency's decision.  See Simmons, 120 F.3d at 669; see also Citizens Against Burlington, 938 F.2d at 195-96.  Ultimately, the court only determines whether the agency "followed required procedures, evaluated relevant factors and reached a reasoned decision."  Id. (internal quotations and citations omitted).

In this case, the court is not persuaded by Plaintiffs' argument citing the inadequacy of the Final EIS's "No-Build" analysis.  NEPA requires an agency to include an alternative of "no-action" in its analysis of alternatives.  See 40 C.F.R. § 1502.14(d).  Here, the "No-Build Alternative" analysis is presented in Section 3.1.1 of the Final EIS.  FHWA 8536-37.  Analyzing this alternative in light of the purpose and need of the project, Section 3.1.1 concludes:

> [T]he No-Build Alternative does not address the need for this project.  However, it is presented with the awareness that any proposed construction alternative will result in impacts to the man-made and natural environments, and may face regulatory obstacles as a result.  The No-Build Alternative is therefore presented as a benchmark by which to judge the Build alternative and determine if the benefits of the Build Alternative outweigh its impacts and regulatory requirements.

FHWA 8537. As the Final EIS explains, the No-Build Alternative is inconsistent with the purpose and need of the proposed project. Section 1.2.1 of the Final EIS clearly identifies that the regional purpose and need for the project "is to provide transportation improvements which would increase access across the Fox River in the North Region of Kane County . . . [and] to provide access to proposed land uses in the Northern region which are compatible with Kane County's 2020 Land Resource Management Plan and local land use plans." FHWA 8341, 8346. This is supported in the record by, among other things, the *Transportation Study* and the *Traffic Study*. By its very nature, the No-Build Alternative cannot satisfy these objectives. Finding that this is adequately explained in the Final EIS, the court concludes that no further analysis is needed. Thus, after considering the "No-Build Alternative" section of the Final EIS along with the entire Administrative Record, the FHWA followed the proper procedures and reached a reasonable decision. See Colorado Environmental Coalition, 185 F.3d at 1176; see also Simmons, 120 F.3d at 669.

Also, the court is not persuaded by Plaintiffs' argument citing the insufficiency of the analysis of reasonable alternatives for the North Region. NEPA states that an EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14. In defining the scope of this analysis, NEPA mandates that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

The alternatives for the North Region were discussed in Section 1.2.2 of the Final EIS. See FHWA 8341. As this section indicates, aside from the Bolz Road corridor, three others were

considered, including corridors along County Line Road, Miller Road/Lake Marian Road and Boncosky Road. Section 1.2.2 states:

> Only the Bolz Road corridor survived the screening process of the *Corridor Analysis Document.* Based on the *Corridor Analysis Document,* Kane County concluded that County Line Road, Miller Road/Lake Marian Road and Boncosky Road were unacceptable because of adverse impacts to the human and natural environment that were obvious and unavoidable.

*Id.* Although brief, this section contains an adequate discussion as to why the three other alternatives for the North Region were eliminated from the detailed study. *See* 40 C.F.R. § 1502.14(a). Mainly, this was because of adverse impacts to the human and natural environment which are outlined in the *Corridor Analysis Document. See* FHWA 8341. In other words, these other three alternatives were not prudent and feasible under the circumstances.

Nevertheless, Plaintiffs argue that the *Corridor Analysis Document* is flawed because it does not adequately compare the destruction of Section 4(f) properties between the four alternatives. However, the *Corridor Analysis Document* does not require such a comparison. The *Corridor Analysis Document* seeks only to identify major issues associated with the construction of each corridor. This allows agencies to determine which alternatives are reasonable candidates for further study and should be included in the EIS. *See* Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 706 (3d. Cir. 1999).

Here, the *Corridor Analysis Document* recommends that three corridors in the North Region, excluding the Bolz Road corridor, be dismissed for various reasons. *See* FHWA 2208-12. For example, it states that County Line Road would displace 40-60 homes and pose serious engineering problems due to the existing grades. FHWA 2209. It also states that the Miller Road/Lake Marion Road and Boncosky Road corridors pose adverse impacts on Section 4(f) properties which are unacceptable to Kane County. *See* FHWA 2210-12. These include, *inter*

*alia*, impacts on wetlands that cannot be mitigated and the use of Public Recreation Areas. Additionally, the *Corridor Analysis Document* states that these alternatives present possible contact with hazardous waste sites, potential engineering problems due to current grades and other socioeconomic factors. See id. After analyzing the potential impacts of each alternative, the *Corridor Analysis Document* concludes that there are no prudent and feasible alignments which could avoid or mitigate these adverse impacts. See id.

Conversely, the *Corridor Analysis Document* determines that the Bolz Bridge Project is not likely to present any major issues under Section 4(f) or NEPA. See FHWA 2208-12. As a result, it recommends that only the Bolz Road corridor advance for further study, thereby declaring that the other three alternatives in the North Region are not prudent or feasible given the purpose and need for the project. See id.

Based on this information, the FHWA was satisfied that the Bolz Road corridor, with its proposed alignments, was the only reasonable alternative for the North Region. This is all that NEPA requires. See Concerned Citizens Alliance, 176 F.3d at 706 (concluding that NEPA allows agencies to exclude from further study alternatives that were examined and rejected for not meeting the project's goals). Additionally, Plaintiffs have not offered any evidence suggesting that these alternatives, or any others, could better fulfill the purpose of the project with causing less harm to the environment. See Morongo Band of Mission Indians v. Federal Aviation Administration, 161 F.3d 569, 576 (9th Cir. 1998) (indicating that the burden is on the party challenging the agency action to offer feasible alternatives when not satisfied with the alternatives chosen for study). Therefore, after reviewing the analysis of reasonable alternatives in the Final EIS, which references the analysis contained in the *Corridor Analysis Document*, the

court finds that the discussion is sufficient under the circumstances, and the FHWA's decision to issue the ROD was not arbitrary and capricious.

## D. Section 4(f) of the Transportation Act

Section 4(f) of the Transportation Act requires that the FHWA take "certain measures if it determines that a transportation project will 'use' natural and historic resources protected by the statute." City of Bridgeton v. FAA, 212 F.3d 448, 460 (8th Cir. 2002) (quoting 49 U.S.C. § 303(c)). The statute prohibits the Secretary of Transportation from approving any project requiring the use of a public park, recreation area, or any significant historic site unless "(1) there is no prudent and feasible alternative to using that land and (2) the program or project includes all possible planning to minimize harm to the [protected property]." 49 U.S.C. § 303(c). By the very existence of the statute, the protection of parkland is to be given "paramount importance." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412-13 (1971).

When reviewing whether an agency's decision to use Section 4(f) property is appropriate, the court must ask "whether a responsible, well-informed public official could think the decision to build through [the Section 4(f) property] 'prudent.'" Eagle Foundation, Inc. v. Dole, 813 F.2d 798, 804 (7th Cir. 1987) (emphasis in original). The Secretary's decision for deciding what is prudent "calls for judgment, for balancing, for practical settlement of disputes, on which reasonable people will disagree." Id. Like NEPA, review of an agency action under Section 4(f) of the Transportation Act is deferential, and the Secretary's decision will only be set aside if it is arbitrary and capricious. Citizens to Preserve Overton Park, 401 U.S. at 414-16; Eagle Foundation, 813 F.2d at 804.

Plaintiffs make three arguments with regard to Section 4(f) properties. First, they argue that the Final EIS Section 4(f) analysis is flawed because it is limited to looking at variations of

only the Bolz Road corridor, thereby excluding possible variations of the other three corridors proposed for the North Region. However, as the court has already discussed, these alternatives were dismissed early in the administrative process because they did not meet the purpose and need for the project, or because they had unique environmental problems of their own. See *supra*, Part III.C.4. Section 4(f) provides that the agency take a hard look when deciding whether to use public parkland for a highway project. However, it does not require that the Secretary thoroughly exhaust every possible alternative, particularly when an alternative is declared imprudent or infeasible for various reasons. See Concerned Citizens Alliance, 176 F.3d at 706. Further, Plaintiffs do not suggest how these other three alternatives may be more practical. They only claim that by not analyzing the issues in the Final EIS, the Secretary failed to take a hard look at possible alternative to using Section 4(f) land. This is not enough to challenge an agency's choice of reasonable alternatives. See Morongo Band, 161 F.3d at 576 (indicating that the burden is on the party challenging the agency action to offer feasible alternatives when not satisfied with the alternatives chosen for study). Therefore, this challenge cannot stand.

Second, with regard to Section 4(f), Plaintiffs argue that the Final EIS fails to provide a detailed assessment of alternative alignments that were considered for the Bolz Road corridor itself. Specifically, Plaintiffs argue that the discussions on alternative alignments to avoid both the Hickory Hills Park and the Perry Lathrop House (a property eligible for inclusion on the National Register of Historic Places) are insufficient. However, this argument also fails because the proposed alignments, which would avoid these Section 4(f) properties, were thoroughly considered and determined not to be prudent or feasible.

With respect to Hickory Hills Park, the ROD states:

> An alignment shift to the south to avoid the park would displace a school and approximately 60 residences. To accomplish an alignment shift to the north . . . would require the use of substandard design in the form of sharp curves and minimal tangents. A substandard design would compromise safety . . . .

FHWA 10275. This summary was compiled from the analysis presented in the Administrative Record, including the Final EIS. Additionally, these impacts, along with numerous mitigation measures, were discussed and analyzed with great detail in the Final EIS. See FHWA 8744-45; 8749-50. Thus, before making its decision, the FHWA considered the displacement of a school and approximately 60 homes, the perceived danger of the proposed alignments, and the mitigation efforts of parties involved before making its decision. As such, the court finds that the FHWA took a hard look at the issue and reached a prudent decision. See Eagle Foundation, Inc, 813 F.2d at 807 (stating that "[t]he Secretary's obligation is to look at enough alternatives to make possible an informed judgment about whether one is likely to be feasible and prudent."). Such action was not arbitrary and capricious. See id. at 808.

Finally, Plaintiffs' argument that the Section 4(f) analysis does not give proper weight to the effect the Bolz Bridge Project would have on the Perry Lathrop House also fails. Much like the Section 4(f) analysis for Hickory Hills Park, the Final EIS considers three different alignments to avoid using the Perry Lathrop House property, as well as numerous potential mitigation measures. See FHWA 8749-50. After thoroughly examining the issue, the FHWA issued the ROD, satisfied that these alternatives were neither prudent nor feasible. See Eagle Foundation, 813 F.2d at 807. Because Plaintiffs do not contend that any other alternatives should have been considered, aside from those which were previously dismissed, this claim also fails. See Morongo Band, 161 F.3d at 576.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED;

Defendants' Motions for Summary Judgment are GRANTED.

IT IS SO ORDERED.

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 3/30/04